United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,                    Case No. 26-20059

v.                                  Hon. Denise Page Hood

Kyle Wagner,

        Defendant.

_____/

## RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTION APPEALING DENIAL OF BOND [ECF NO. 17]

For the reasons stated in the attached brief, defendant Kyle

Wagner's motion should be denied.

                                   JEROME F. GORGON, JR.
                                   United States Attorney

                                   *s/ Eaton P. Brown*
                                   EATON P. BROWN
                                   Assistant United States Attorney
                                   211 W. Fort Street, Suite 2001
                                   Detroit, MI  48226
                                   Phone: (313) 226-9184
                                   eaton.brown@usdoj.gov

Dated: March 16, 2026

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,                 Case No. 26-20059

v.                                 Hon. Denise Page Hood

Kyle Wagner,

        Defendant.

_____/

**BRIEF IN SUPPORT OF OPPOSITION TO DEFENDANT'S
MOTION APPEALING DENIAL OF BOND [ECF NO. 17]**

**INTRODUCTION**

Know thyself.[1] On the morning federal agents arrested Kyle Wagner, he warned them not to "let [him] back out" before expressing an intent to kill. After weeks of publishing violent and threatening tirades on social media, Wagner knew what he was capable of. His frenzied online posts promoting destruction and chaos, his desire to "evade" police, his lack of stable employment or residence, and his absence of connections to this jurisdiction make Wagner a danger to

---

[1] Socrates.

2

society and a risk of nonappearance. 18 U.S.C. § 3142(g). His motion should be denied.

## BACKGROUND

### A. Wagner's threats and incitement to violence.

Wagner is a resident of Minneapolis, Minnesota, and a self-described Antifa[2] member, Satanist, and "crazy leftist." Since at least January 2026, Wagner has expressed persistent and escalating opposition to federal law enforcement. In multiple social media posts, Wagner has conspired and threatened to assault federal agents and interfere with and impede law enforcement operations. Prior to his arrest, Wagner maintained a robust online presence posting nearly daily on social media platforms like Instagram (@kaos.follows, @antifa.kaos) and Facebook. In his videos and written messages, Wagner labeled ICE agents "aggressors," the "Gestapo," and "murderers." Wagner also posted videos of himself delivering gas masks and other supplies to agitators in Minneapolis.

On January 8, 2026, Wagner posted a video in which he announced, "ICE we're f***ing coming for you":

---

[2] On September 22, 2025, the federal government designated Antifa a domestic terror organization.



The video had over 2,000 "likes." The next day, Wagner told his followers to continue their "constant harassment of ICE" and "cripple them." Wagner declared "any time we have an opportunity to get our hands on [ICE], we need to put our hands on them." The response from Wagner's followers across the country was nearly unanimous:

5



Wagner further encouraged his supporters to "hunt ice...disable their vehicles-surround them and disarm them – arm yourself and work in crowds...[R]ise up now – in every corner of this country and fight ice. This is kill or be killed..."

On January 12, 2026, Wagner posted another video on Instagram in which he informed his followers that nearly 1,500 ICE agents were coming to Minneapolis. Wagner commanded "every armed citizen, you

have a choice to make whether you allow this to stand in our community or not." Wagner's post received 26,000 "likes":



The next day, Wagner escalated his rhetoric: "This is where ICE has come to die…We want to know who they are. We will identify every single one of them and we will prosecute them to the fullest extent of the law. If that has to be done at the barrel of a gun, then let us have a little f****** fun." Wagner's followers understood his calls for violence.

One user expressed a desire to join Wagner's "cause." Another encouraged financial support for Wagner's efforts by listing Wagner's Venmo account. Still another follower declared, "Time for them to meet your friends. Namely AR15 and 9MM":



Following the January 24, 2026, officer-involved shooting of Alex Pretti, Wagner's rhetoric became more unbalanced. (Exh. 1, 1/24/2026 Instagram Video @Kaos.follows). A video posted to his Instagram account that day shows Wagner shirtless and screaming angrily into a camera. He ordered his followers to stop banging drums and singing

7

songs and "go and f****** fight them [law enforcement]. Or shut the f*** up and die for them." (*Id.* at 00:51).

Wagner also provided tangible support to those he encouraged to disrupt law enforcement and exact violence. In a January 25 video, Wagner told his followers, "I have my truck on standby. I have gas masks on the ground there, as much as I could deliver. I have people en route. If you're seeing this video, we're done with peaceful protests now. The gloves come off and ICE needs to get out. Run for the hills, boys." Wagner then instructed his viewers to "put[] hands on these murderers."

Wagner's audience was not just in Minneapolis. In response to a video telling his thousands of followers to "[g]et your f***** guns and stop these f***** people," one Instagram user commented, "How can we help from out of state[?]" Another follower responded, "…I'm about to try and head your way. Working on child care now. Coming from Madison wisco[.]" Two days later, Instagram and Facebook removed Wagner's violent and lawless posts. In response, Wagner created a new Instagram account in which he announced he was "on the run now" and had safe places and evacuation plans.

Wagner's nearly constant online presence encouraging violence meant he had little to no source of income. He turned to Instagram for financial support, and to "help [him] evade and continue to organize." This post had nearly 1,500 "likes":



## B. Wagner opposes and doxes supporters of law enforcement.

Law enforcement was not the only subject of Wagner's ire. His hatred for federal agents spread to their supporters as well. On January 10, 2026, Wagner posted a video of the officer-involved shooting of Renee Good and captioned the video, "Watch it as many times as you

need. If you side with the gunman. (sic) We're coming for you too." Wagner also encouraged his supporters to oppose a January 17 pro-ICE rally in Minneapolis. Posing in a bullet-proof vest, Wagner ordered his followers to be on the street and stand in armed defense of the city.

On January 29, 2026, Wagner used his Instagram account to publish the full name, birth month and year, and phone number, of J.S., a person Wagner believed to be an ICE supporter. He also posted an address where he believed J.S. lived with his parents in Michigan. In his post's text, Wagner called J.S. a "b.b. nazi boy" and threatened "we can all knock on strangers (sic) doors…See you soon kiddo – stay safe out here."



**C. Wagner resists and assaults arresting officers.**

In the early morning hours of February 5, 2026, law enforcement arrested Wagner at an apartment in Minneapolis. Within moments of their arrival, local agitators arrived blowing whistles and yelling at the officers. After handcuffing Wagner and transporting him for processing, Wagner harassed, spit on, and physically resisted the agents. He also cautioned the officers not to let him out and expressed an unspecified intent to kill. A search of Wagner's residence revealed Antifa-branded clothing and writings, one phone, two iPads, a box of gas masks, and

11

some shotgun shells. In his booking photo, Wagner made an obscene gesture boldly declaring, "This is for the judge."



**D. A federal magistrate detains Wagner finding he is both a risk of flight, and a danger to the community.**

The day of his arrest, Wagner made his initial appearance before a federal magistrate in Minneapolis. He immediately requested a detention hearing. Magistrate Judge David Schultz found probable cause to believe Wagner had made interstate threats and engaged in cyberstalking. (Exh. 2; Order of Det., 2). Judge Schultz also granted the government's motion for detention finding that Wagner presented a risk of flight and a danger to the community. (*Id.*).

12

### E. A federal grand jury indicts Wagner.

On February 11, 2026, a federal grand jury indicted Wagner on one count of interstate communications involving threats, and one count of cyberstalking. (ECF No. 10, PageID.49-53). He made his initial appearance and was arraigned in Detroit on February 26.

## ARGUMENT

The district court reviews the appeal of a magistrate judge's order of detention de novo. *See United States v. Stone*, 608 F.3d 939, 944 (6th Cir. 2010); *United States v. Koubriti*, No. 01-80778, 2001 WL 1525270, at *5 (E.D. Mich. Oct. 16, 2001) (noting that while the Sixth Circuit has not addressed explicitly the appropriate standard of review, district courts within the circuit, as well as other circuits, apply de novo review). But the district court is not required to hold an additional evidentiary hearing as part of that review, *see United States v. King*, 849 F.2d 485, 489–90 (11th Cir. 1988), and the government—or the defendant—is allowed to "present information by proffer or otherwise." 18 U.S.C. § 3142(f).

In determining whether detention is warranted, the district court must consider (1) the nature and circumstances of the offense charged;

13

(2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger posed by the person's release. 18 U.S.C. § 3142(g).

## A. The nature and circumstances of Wagner's offense.

By their very nature, charges like "threats made in interstate commerce" are "sufficiently serious to weigh in favor of [a defendant's] detention." *United States v. Meister*, No. CR1902738001, 2020 WL 1935523, at *3 (D. Ariz. Apr. 22, 2020). The circumstances surrounding Wagner's threat confirm that here.

Wagner is bent on fomenting chaos and violence, no matter the cost. For weeks, on a near-daily basis, he published videos and messages to an audience of thousands encouraging them to impede, harass, and injure law enforcement. These posts promoted the use of physical assault and weapons against federal agents. Consider a few:

- "ICE we're f***ing coming for you"
- "we need to put our hands on them."
- "hunt ice"
- "fight ice. This is kill or be killed"
- "This is where ICE has come to die... If that has to be done at the barrel of a gun, then let us have a little f****** fun."
- "f****** fight [law enforcement]"
- "we're done with peaceful protests now. The gloves come off . . . Run for the hills, boys."
- "put[] hands on these murderers."

14

- "[g]et your f***** guns and stop these f***** people"

Wagner claims these statements merely tell his followers to "stand their ground," "defend themselves" only when "unlawfully attacked or assaulted," and "not to instigate violence." Def.'s Br. at 6. That's plainly false. Telling people to "hunt ice," "fight ice," "put hands" one ICE, "kill or be killed," and "we're done with peaceful protests" and that "ICE has come to die . . . [if necessary] at the barrel of a gun" encourages violence.

Understanding that context is critical because Wagner then extended these threats to federal law enforcement supporters, saying: "If you side with [ICE, w]e're coming for you too." Then he doxed J.S.'s personal information and address. And he followed this disclosure with an explicit message that Wagner (and others) would soon come to J.S.'s house. Notably, J.S. openly supports the efforts of federal law enforcement agencies, including ICE. And these threats were all the more troubling because of Wagner's nationwide audience of followers who, on multiple occasions, offered their financial and physical support of his efforts—including across State lines.

Make no mistake—in assessing the sort of danger Wagner poses to J.S. and his parents, it is entirely appropriate for the Court to consider

Wagner's earlier posts. In *United States v. Cooper*, No. 3:19-MJ-04254-1, 2019 WL 4259454, at *4 (M.D. Tenn. Sept. 9, 2019), the defendant threatened to "shoot up" a Planned Parenthood. *Id.* To understand the weight or "gravity of that statement" for detention purposes, the court considered an "earlier post" where the defendant had threatened to kill federal law enforcement with language like "whatever it takes" and "I am serious." *Id.* Likewise, Wagner has repeatedly threatened federal law enforcement officers in Minneapolis with physical violence and death and has said "we" are coming to mete out the same to law enforcement supporters. Given this context, Wagner's "online post[] . . . promise[s] the most serious" danger to J.S. and his family—with the conviction that his promise is "not idle." *Id.*

Wagner's opinion that the victim, J.S., is a "notorious online provocateur" does not make Wagner any less dangerous. (ECF No. 17, PageID.64). Nor should the Court consider Wagner's belief that he was *only* republishing another person's "dox" of J.S. (*Id.*, PageID.65). That Wagner used someone else's work as part of and to concretize and validate his own threat doesn't make it any less serious. Further, it is Wagner, not J.S., who is under indictment—trying to shift the focus as

16

Wagner does smacks strongly of victim blaming. And Wagner's history of violent rhetoric, his disclosure of J.S.'s address, followed by Wagner's facetious direction to "stay safe out there," demonstrate the danger Wagner poses if he does not remain in custody.

### B.  The weight of the evidence against Wagner.

The weight of the evidence of Wagner's dangerousness and risk of nonappearance is strong. *See Cooper*, 2019 WL 4259454, at *3 (noting in a threats case that evidence like "screen shots of" online posts are good "evidence supporting a finding of danger"). Release on conditions of bond offers someone like Wagner, with a dogmatic commitment to violent protests and a sporadic work history, too much freedom to continue his criminal pursuits. Wagner's proposed third-party custodian—his mother—does not solve this problem. (ECF No. 17, PageID.68). The commission of online threats and cyberstalking requires only an electronic device and the internet. And since each of these crimes was accomplished from the confines of Wagner's home, this Court should not be inclined to give Wagner another chance to foment violence from his parents' living room. (*Id.*, PageID.68).

17

Wagner also poses a risk of nonappearance. In addition to his lack of job, and absence of residential stability, Wagner has an outstanding probation violation warrant and criminal charges originating in Iowa and Colorado. The magistrate's determination that Wagner posed a risk of nonappearance was not based on "faulty assumptions," but on Wagner's own words at the detention hearing. (ECF No. 17, PageID.66). When the magistrate asked about Wagner's job history and residence, Wagner said he was "couch surfing," and had no stable income. Moreover, Wagner's declaration on social media that he was "on the run" and needed financial assistance to help him "evade," further show his risk of nonappearance.

The great weight of this evidence demonstrates that Wagner is incapable of being supervised successfully outside of prison. He should therefore remain detained.

## C. **Wagner's history and characteristics.**

In evaluating a defendant's history and characteristics, the district court should consider, among other things, his employment history, his character, and his community ties. *See* 18 U.S.C. § 3142(g)(3)(A). The government does not have to show a record of prior

convictions for violent or dangerous conduct to detain a defendant as a danger to the community; the Bail Reform Act requires only a showing of *dangerousness. United States v. Rodriguez*, 950 F.2d 85, 88–89 (2d Cir. 1991) (rejecting idea that the government must prove a history of violence or dangerous conduct to detain a defendant pretrial as a danger to the community); *see also Stone*, 608 F.3d at 950.

Indeed, courts routinely order detention in threats-in-interstate-commerce cases without a criminal history or weapons. *See, e.g., United States v. Comberger*, No. 5:21-MJ-05138, 2021 WL 1725516, at *4 (E.D. Ky. Apr. 30, 2021) (noting no past violence or other threats); *Cooper*, 2019 WL 4259454, at *3 (noting no weapons or criminal history). In *United States v. Bailey*, No. 8:25-CR-387, 2025 WL 2897026, at *5 (M.D. Fla. Oct. 10, 2025), for example, the court ordered the defendant detained because he had made "intimidating, frightening, and violent videos" threatening the CEO of X, contextualized by a "pattern of threatening murder and his self-proclaimed hatred for certain groups of people." The defendant had no criminal or otherwise violent history, though he had discussed weapons. That's all like Wagner, who has no criminal history either, but who made a specific threat of violence

19

against a particular person, while having previously made many threats—including murderous threats—against a particular group of people (federal law enforcement).

Or take *United States v. Cole*, 465 F. Supp. 3d 1175 (W.D. Wash. 2020). There, a neo-Nazi defendant was charged with threatening communications when he affixed to certain homes posters saying "you have been visited by your local Nazis" and depicting an image of a hooded figure with a Molotov cocktail. The court detained defendant Cole even though he had "no criminal history or history of violent acts." *Cole*, 465 F. Supp. 3d at 1178. Just like Wagner here, the defendant had shown the victims that he knew "where they live"; he "sought to instill fear and intimidation in" them, making "them feel unsafe in their own homes"; he actively tried to "avoid law enforcement," including by ignoring warrants; and has "ties to an extremist"—here, domestic terrorist—organization. *Id.* Like the defendant in *Cole*, Wagner, too, should be detained.

Admittedly, "the Court knows little about [Wagner's] personal characteristics, beyond his proclivity for threatening and advocating violence." *Comberger*, 2021 WL 1725516, at *6. But it does know that

20

Wagner's complete disregard for authority shows the lack of respect he has for any conditions of release this Court might impose. And Wagner has no ties to this district. (ECF No. 17, PageID.62-63). Indeed, Detroit is about 700 miles from the location at which he proposes to reside. (*Id.*, PageID.67). And Wagner's online solicitation of monetary support and lack of stable employment only underscore his financial instability and risk of nonappearance. Wagner's history and characteristics make him both a danger to the community and a flight risk.

**D. The nature and seriousness of the danger Wagner poses to the community.**

Wagner poses a grave public danger. And the proof of that dangerousness is clear. The last few months tell the story of a man in the grip of an ideology marked by chaos and violence. Even the adjectives he uses to describe himself— "Satanist" and "crazy leftist"— advise against his release.

And Wagner's words come at a time when agitating and obstructionist behavior in cities like Minneapolis have resulted in multiple assaults on law enforcement and the death of civilians. Wagner's aggressive rhetoric directly and causally fans these flames. "Now more than ever, the Court must take seriously [Wagner's]

21

statements, and his concerns about the same." *United States v. Lidderdale*, 795 F. Supp. 3d 1024, 1028 (S.D. Ohio 2025). From Donald Trump to Nancy Pelosi's husband to state and federal lawmakers to Supreme Court justices to district court judges, the "targeting of public officials has become a virulent issue which must be universally condemned." *Id.* And the "recent attacks on ICE officers" that Wagner stridently promotes is just a "different strain[] of the same virus." *Id.* at 1029. This Court should take seriously Wagner's role in this "macabre phenomenon"—that is, his advocacy "of violence, in lieu of democratic processes, toward political ends." *Id.* The more people see "public support" for political violence, "the more common it is." *Id.* Because even "non-violent forms of obstruction of justice"—let alone the openly violent and murderous form Wagner espouses— "pose a sufficiently serious danger to the community," Wagner's "pretrial detention is warranted." *United States v. Richardson*, No. 2:11-CR-220, 2011 WL 5026456, at *6 (S.D. Ohio Oct. 21, 2011).

Additionally, his specific threats to J.S. before an audience of thousands of followers across the nation is a menacing and frightening act. *Lidderdale*, 795 F. Supp. 3d at 1030 (noting that threats of physical

22

violence are "harmful for the emotional injury inflicted on the victims," especially when the threatener knows the "victim's home address").

In short, "the nature of the potential danger risk [Wagner] poses is multifaceted. It encompasses a risk of physical harm and violence to actual people"—J.S. and others— "as well as interference with and disruption of the administration of justice. These risks are unquestionably grave." *Comberger*, 2021 WL 1725516, at *6. In *Comberger*, a defendant charged with facilitating interstate prostitution made a threat online, saying of police cooperators: "a piece of shit snitch informant ranks side by side with a child molester and a rapist. They ALL deserve a bullet between the eyes." *Id.* at *4. Like Wagner, the defendant had no violent past. But because of prior violent and intimidating comments—like saying he would have cut a potential cooperator's "fucking throat" and telling another witness to "keep her fucking mouth shut"—the court found these dangers "concrete and serious" enough to "favor[] detention." *Id.* The same is true here. Wagner's many and explicit calls to violence against federal law enforcement and its supporters not only endanger officers and agents,

23

but they also bring to light what his, "in context, thinly veiled threat[]" against J.S. truly mean.

Finally, that "the frequency of threats and disconcerting behavior on the part of [Wagner] ha[d] escalated" just before his arrest is even more evidence in support of detention. *United States v. Jeffries*, No. 3:10-CR-100, 2010 WL 3619946, at \*5 (E.D. Tenn. Sept. 10, 2010) (using escalation, among other things, to order detention). Wagner had escalated to frequent, unhinged posts and rants in the days just before his arrest. And Wagner himself noted to law enforcement while being arrested, they should not let him back out—he had an intent to kill. Admissions like this in threats cases weigh strongly in favor of detention. *Lidderdale*, 795 F. Supp. 3d at 1027 (detaining, in part, because the defendant "was afraid he would continue" making threats). Indeed, Wagner was displaying precisely the sort of "hit a boiling point" crisis moment that courts considering detention in cyberstalking and interstate threats cases take extremely seriously. *Id.* at 1031.

### E. Bond conditions are especially unworkable here.

It is difficult to surmise a condition, or combination of conditions, of bond that will change Wagner's ideologically grounded penchant for

24

lawlessness and ensure the safety of the community. That's especially true given that "the alleged threatening conduct takes place on the internet," meaning it would be "access[ible]" no matter where Wagner lives. *Cooper*, 2019 WL 4259454, at *4.

Wagner's proposed conditions limiting his conduct are empty promises for a few reasons. For one thing, as the court explained in *Comberger*, 2021 WL 1725516, at *6, given "the infinite number of possible communication methods, it would undoubtedly be nearly impossible to police all of [a defendant's] communications and interactions to ensure he ceases the sort of conduct that he has already demonstrated on several occasions." *See also United States v. Poulsen*, 521 F. Supp. 2d 699, 706 (S.D. Ohio 2007) (same, nearly 20 years ago).

But even more importantly, Wagner's "stated disdain" for—really, hatred of—federal "law enforcement . . . casts doubt on the effectiveness of any conditions the Court might impose." *Cooper*, 2019 WL 4259454, at *4. Especially in view of his escalating rhetoric and behavior, the Court has no reason to trust him and every reason to doubt him. Someone who has repeatedly expressed a willingness to "kill

or be killed" in the fight against federal law enforcement won't be

bothered by a few finger-wagging bond conditions.

## CONCLUSION

Wagner's motion should be denied.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

*s/Eaton P. Brown*
EATON P. BROWN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Eaton.Brown@usdoj.gov
(313) 226-9184

*s/Frank Dame*
FRANK DAME
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Frank.Dame@usdoj.gov
(313) 226-9526

Date: March 16, 2026

26

## Certificate of Service

I certify that on March 16, 2026, I electronically filed this Response with the Clerk of the Court using the ECF system, which will send notification of such filing to the following attorney of the defendant:

Jean Pierre Nogues, III
Jean_nogues@fd.org

/s/ *Eaton P. Brown*
Eaton P. Brown
Assistant United States Attorney