**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA, Case No. 26-20059

Plaintiff, Hon. Denise Page Hood

v.

KYLE WAGNER,

Defendant.
__________________________________/

**MOTIONS TO DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION AND FOR DISCLOSURE OF GRAND JURY MATERIALS**

Kyle Wagner, through counsel, moves under Federal Rules of Criminal Procedure Rules 12(b)(1) to dismiss both counts of the Indictment for selective prosecution. He also moves under FRCP 6(e) for disclosure of grand jury materials. Per Local Rule 7.1, opposing counsel was consulted and does not concur in the motion.

Respectfully submitted,

FEDERAL COMMUNITY DEFENDER

s/ Riyah Basha
RIYAH BASHA
ELIZABETH YOUNG
JEAN PIERRE NOGUES
Attorney for Kyle Wagner
613 Abbott St., 5th Fl.
(313) 967-5839
riyah_basha@fd.org

Dated: November 16, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

KYLE WAGNER,

Defendant.
_______________________________/

Case No. 26-20059

Hon. Denise Page Hood

**BRIEF IN SUPPORT OF KYLE WAGNER'S MOTION TO DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION AND FOR DISCLOSURE OF GRAND JURY MATERIALS**

Kyle Wagner's prosecution stems from Operation Metro Surge. Metro Surge involved an influx of Immigration and Customs Enforcement officers into the Minneapolis metro area. Many Minneapolis residents disagreed with the goals of Metro Surge. Metro Surge's dissenters registered their disagreement in the form of political protest—Wagner was one of them. The political protesters, themselves, became a target for the government.

Wagner and J.S. engaged in a caustic online debate about ICE. They traded sharp words. They made clear their respective political positions. J.S.'s position favored the government; Wagner favored the dissenters. Only the dissenting position, Wagner, faces federal criminal charges.

There's another reason to suspect Wagner's charges are unconstitutional: political persecution. As already explained in the Motion to Dismiss the Indictment on First Amendment, Kyle Wagner did not make a true threat. No objectively reasonable listener would read a serious expression of intent to commit an act of violence in his messages directed at J.S. That Wagner did not make a true threat, yet ended up prosecuted for one, is one reason why this Court ought to suspect a selective prosecution at play.

For the reasons more fully explained below, there is good reason to suspect an unconstitutional selective prosecution. Wagner was targeted for his political viewpoint, nothing more. Accordingly, this Court should dismiss the indictment.

Wagner requests the Court order disclosure of the government's grand jury presentation as well. The facts known about the Government's targeting of its political opponents, combined with the very language used in the Government's public filings in this case, raise the specter that the government a) watered down the law before the Grand Jury and/or b) left them uninformed as to the full unabridged nature of Mr. Wagner and J.S.' tit-for-tat communications, so as to make the charges stick against a political enemy of the Trump Administration.

## STATEMENT OF FACTS

Mr. Wagner is from Minnesota, and he is alleged to have committed the acts charged in this case while in Minnesota. He was arrested in Minnesota, and first appeared in Minnesota.

He has also been separately charged in another case in the District of Minnesota, along with numerous co-defendants. *See United States v. Sant et. al*, Case No. 26-cr-00115 (D. Minn.) The defendants and legal counsel in that Minnesota case, far more intimately aware of what was happening on the ground in Minneapolis in the weeks and months leading to and following Mr. Wagner's arrest, have filed a motion for disclosure of further discovery under Rule 16, *Brady*, and *Giglio*. The motion lays out that the federal government engaged in a massive domestic surveillance effort targeting American citizens solely on the basis of their participation in legal, First Amendment-protected opposition to federal immigration policies. *See* Motion for Discovery, *Sant et. al*, Case No. 26-cr-00115 (D. Minn.), ECF No. 212. The factual background of that Motion lays out the political circumstances underlying that case in exquisite detail, and the defense in this case respectfully adopts it in full. *See id.* at pp.1-20.

The parts most relevant to this prosecution in the Eastern District of Michigan are incorporated here, with thanks.

### A. National Security Presidential Memorandum-7 targets protesters based on their politics

President Trump and senior administration officials routinely speak of the political left in de-humanizing terms – as "deformed," "scarred," and "filled with envy and hatred," for example.[1]

The administration has crystallized these sentiments into policies that encourage and authorize political prosecutions like this one. Most notably, in September 2025, President Trump issued National Security Presidential Memorandum 7 ("NSPM-7"), which directs DOJ to prosecute ICE protesters and opponents of the administration. *See Sant et. al*, Case No. 26-cr-00115 (D. Minn.), ECF 212-26, pp.1-7. NSPM-7 is a blueprint for prosecution and harassment of those

---

[1] For example, administration Chief of Staff Stephen Miller has stated:

> The leftist is fundamentally motivated by envy, by hatred, by jealousy. The leftist looks at what is beautiful and what is good and what is natural and is filled with envy and hatred. The leftist looks at a perfect family with a perfect life and a perfect job and perfect kids that goes to church every Sunday and is filled with a feeling of inadequacy and jealousy, and they covet. And they turn those emotions ultimately into a desire to subjugate, to oppress, and to inflict pain and suffering.
>
> It's not a coincidence that when you look at these violent antifa demonstrations and you see any photograph of those who were assembled – to be blunt, not one of the people that is demonstrating looks like a normal person. Not one looks normal. They're all deformed in some way – in their appearance, in their dress, in their mannerism. . . . Every one of them, through the course of their life and their decisions, has scarred their body and their appearance in many different ways, to the point in which their outer appearance becomes a manifestation of their inner hatred.

*See Sant et. al*, Case No. 26-cr-00115 (D.Minn), ECF 212-27, p 13.

who protest ICE abuses or otherwise oppose this administration. NSPM-7 refers to protests of ICE activity in Portland and Los Angeles (it labels them "riots"), describing these protests as "a culmination of sophisticated, organized campaigns of targeted intimidation, radicalization, threats, and violence designed to silence opposing speech, limit political activity, change or direct policy outcomes, and prevent the functioning of a democratic society." *Id.*

NSPM-7 directs DOJ and DHS to implement a "new law enforcement strategy that investigates all participants in these criminal and terroristic conspiracies — including the organized structures, networks, entities, organizations, funding sources, and predicate actions behind them . . . ." *Id.* at 2. It concludes: "Through this comprehensive strategy, law enforcement will disband and uproot networks, entities, and organizations that promote organized violence, violent intimidation, conspiracies against rights, and other efforts to disrupt the functioning of a democratic society." *Id.* at 2-3.

In short, NSPM-7 directs the investigation and prosecution of those who oppose ICE and who DOJ views as acting inappropriately to "change or direct policy outcomes" or "disrupt the functioning of a democratic society." NSPM-7 puts some gloss on this language by describing the "motivations" it considers suspect, including opposition to "traditional American views on family, religion and morality" and "foundational American principles (e.g., support for law enforcement and border

control.)" *Id.* at 2.

**B. The DOJ operationalizes NSPM-7 in Minnesota**

On January 13, 2026, a cadre of experienced and highly-respected federal prosecutors – including the entire management team– resigned *en masse* in protest of the politicization of federal criminal law enforcement in Minnesota.[2]

Assistant Deputy Attorney General Aakash Singh, who directs the prosecutorial priorities of U.S. Attorneys' offices around the country, then directed federal prosecutors to aggressively charge protesters in Minnesota. According to the New York Times:

> In a conference call in late January, the official, Aakash Singh, laid out the department's basis for prosecuting demonstrators: National Security Presidential Memo 7, a sweeping directive issued by President Trump last September. It expanded the definition of domestic terrorism to include not only violent crimes like assault, but also relatively minor ones, like revealing the personal details of agents or getting in the way of immigration enforcement.
>
> Mr. Singh said that "coordinators" in U.S. attorneys' offices responsible for charging protesters under NSPM-7 should be "hounding" federal agents to make cases, according to people familiar with his remarks. He also suggested that the department wanted headlines along with indictments, promising that officials in Washington would be "blasting out" prosecutors' work.

---

[2] Matt Sepic, Joe Thompson, Minnesota's top federal fraud prosecutor, quits over ICE shooting probe, Minn. Pub. Radio (Jan. 13, 2026), https://www.mprnews.org/story/2026/01/13/us-attorney-on-minnesota-fraud-joe-thompson-resigns-from-office.

"Go big," Mr. Singh said, "and go loud."[3]

Singh warned those gathered that President Donald Trump is their "chief client" and anyone uncomfortable with advancing his administration's directives must step aside. According to Bloomberg News: "Participants were taken aback by Singh's comments, which some interpreted as a clear reference to the Minneapolis prosecutors resigning that week after DOJ's orders to investigate protesters and state Democrats. Singh had closely coordinated those efforts, said two people with knowledge of his role."[4]

HSI appears to have begun investigating Mr. Wagner on January 19, 2026 for being "a self-identified Antifa member, who has made multiple threats against Immigration and Customs Enforcement (ICE) on social media." The complaint in this case—alleging speech online directed not at ICE but at a counterprotester who *supported* the administration's immigration policies—was filed two weeks later, on February 3. (ECF No. 1). Mr. Wagner was arrested two days after that. The then-Attorney General's own public statement upon Mr. Wagner's arrest accused him of conduct for which he was never charged—purportedly "doxx[ing] and call[ing] for

---

[3] Alan Feuer, Alexandra Berzon, and Ernesto Londoño, 'Go Big and Go Loud': Inside the Justice Department's Push to Prosecute Protesters, N.Y. Times (Mar. 19, 2026), https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html.

[4] Ben Penn, In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump, Bloomberg Law (Feb. 19, 2026), https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump.

the murder of law enforcement officers"—and explicitly framed the case as a political message from "the Trump Administration." [5]

Other members of the Administration trumpeted the charges against Wagner. Then-White House Press Secretary Karoline Leavitt publicly displayed Mr. Wagner's photograph at a White House press briefing, declaring him "a domestic terrorist" who "will be held accountable," despite the absence of charges alleging domestic terrorism.[6] Now-Attorney General Todd Blanche similarly labeled Wagner "an Antifa terrorist," declaring "under the leadership of President Trump and Attorney General Bondi, there is no safe haven for terrorists . . ."[7]

### C. The Administration has manipulated the Grand Jury process in other prosecutions of its political enemies

Assistant Deputy Attorney General Singh has directed at least one U.S. Attorney's office to employ a corrupt grand jury process: "As multiple grand juries refused to indict Washingtonians on federal charges following mass street arrests, Singh instructed the office's criminal team to ask the chief judge to dismiss jurors

---

[5] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Anti-ICE Antifa Member Arrested on Federal Charges of Cyberstalking and Threatening Communications After Allegedly Calling for the Murder and Assault of Federal Immigration Officers in Minneapolis (Feb. 5, 2026), https://www.justice.gov/opa/pr/anti-ice-antifa-member-arrested-federal-charges-cyberstalking-and-threatening-communications [https://perma.cc/Y65K-T34U].

[6] *See* Steve Karnowski, Minneapolis man accused of cyberstalking, threatening ICE supporter amid crackdown in Minnesota, Associated Press, Feb. 10, 2026, available at *https://perma.cc/8A83-3FYS* (last accessed Mar. 30, 2026).

[7] *See* DOJ press release, *supra*.

who presented hurdles and then 'rinse and repeat' to a new panel."[8] In May 2026, a federal court dismissed an indictment on the basis of vindictive prosecution because of interference from Singh and then-Deputy Attorney General Todd Blanche. *See United States v. Abrego Garcia*, No. 3:25- cr-115, 2026 WL 1454303, at *3 (M.D. Tenn. May 22, 2026) (finding unrebutted presumed vindictiveness and holding "[t]he reopening of the investigation, Blanche's unrebutted statements, and Singh's sustained oversight together support that inference. Blanche's statements tie Main Justice to the tainted investigation and confirm what motivated it.").

Given Singh's history of initiating political prosecutions, it is unsurprising that he helped engineer the unlawful grand jury subpoenas used to harass Democratic political leaders in Minnesota.[9] On June 22, 2026, Chief Judge Schiltz of the District of Minnesota quashed these subpoenas, writing:

> Initiating a criminal investigation in order to harass political opponents or to coerce them into taking official action-particularly official action that the federal government cannot directly require those political opponents to take-is a blatantly unlawful and unethical use the grand-jury process. The only question, then, is whether the challenged subpoenas were issued for one of these forbidden purposes. The Court has no doubt that they were.

---

[8] *See* Penn, *supra.*

[9] Alan Feuer and Glenn Thrush, *Justice Dept. Playbook in Minnesota: Investigate Foes, Protect Allies*, N.Y. Times (Jan. 29, 2026), https://www.nytimes.com/2026/01/29/us/politics/minnesota-justice-department-trump-ice.html.

Order, *In re Grand Jury Subpoenas*, Case No. 26-mc-00043 (PJS), (ECF No. No. 1 at 15, 17-18) (describing "the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries").

## ARGUMENT

### I. The indictment should be dismissed for selective prosecution

Wagner and J.S. engaged in a "back and forth" online. *See United States v. Wagner*, No. 26-1294, 2026 WL 2333589 (6th Cir. Aug. 12, 2026), ECF No. 19-2, PageID.315 (Bloomekatz, J., dissenting). Despite their similar rhetoric and online bluster, only one of them faces federal criminal charges. The sum total of the government's actions in this case, and as compared to its inaction against J.S, make it clear that Mr. Wagner is being prosecuted due to his political affiliations and the content of his speech.

A selective prosecution claim is "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The claim is grounded in the Equal Protection Clause. *See United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998); *United States v. Crowthers*, 456 F.2d 1074, 1080 (4th Cir. 1972) ("For officials of the United States government to selectively and discriminatorily enforce [a regulation by prosecuting violators] so as to turn it into a scheme whereby activities protected by the First

Amendment are allowed or prohibited in the uncontrolled discretion of these officials violates the defendants' right to equal protection of the laws embraced within the due process of law clause of the Fifth Amendment.) (quoting *Bolling v. Sharpe*, 347 U.S. 497 (1954)). Forbidden reasons include the government's desire to prevent the exercise of the defendant's constitutional rights, such as free speech or political association. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("Prosecutorial decisions, like other government actions, cannot turn on the exercise of free speech rights . . ."); *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997).

A selective prosecution claim has two prongs. There must be a discriminatory effect. *Armstrong*, 517 U.S. at 465. And, crucially, the effect must be the product of discriminatory intent. *Id.*

*Effect*: Discriminatory effect requires the accused show that "similarly situated individuals" were not similarly prosecuted. *Jones*, 159 F.3d at 977. That's not a hard burden to carry in this case. Here, the victim himself is a similarly situated individual. As described above, J.S. acted in a manner similar to what Mr. Wagner is accused of. J.S. publicized the address of a journalist because he disapproved of his coverage of ICE activities. He used similarly forceful language cautioning the journalist against further reporting. J.S. even went one step further than Wagner, physically showing up at his target's doorstep.

There is only one rationale for the differential treatment of J.S. and Wagner: the government favors pro-ICE views, and disfavors Wagner's views and political affiliations. Prosecutions like this one place the government's thumb on the scale towards favored speech.

*Intent:* Consider the Trump Administration's blatantly partisan statements surrounding Wagner's prosecution. Those statements came from Administration appointees, from the U.S. Attorney in Minnesota to the White House Press Secretary. Officials publicly harped on Wagner's affiliation with antifa and his anti-law enforcement views. This rhetoric follows the President's instructions to federal law enforcement to investigate and prosecute people with certain "anti-American" and "anti-capitalist" political viewpoints it views as dangerous. *See* NSPM-7, "Countering Domestic Terrorism and Organized Political Violence," 90 Fed. Reg. 47,225 (Sept. 30, 2025). In this way, prosecuting Wagner advanced the political goals of the Administration to repress criticism of ICE.

Thus Wagner has shown, at the very least, "some evidence" of discriminatory effect and intent. *Jones*, 159 F.3d at 978 (quoting *Armstrong*, 517 U.S. at 468). He is thus entitled to obtain discovery, *id*. From there, this Court should hold an evidentiary hearing to determine whether he was singled out for his political speech and activity. *See United States v. Chivers*, 478 F.Supp.3d 623, 633 (S.D. Ohio 2020) (citing *United States v. Bustamante*, 805 F.2d 201, 202 (6th Cir. 1986) (defendant is

entitled to an evidentiary hearing upon making a prima facie case of selective prosecution).

## II. Rule 6(e) permits disclosure of the grand jury materials to investigate a ground for dismissal of the indictment

In support of the above motion, the Court should order disclosure of the government's presentation to the grand jury. Additionally, defects in the indictment raise the risk that the grand jury received incorrect instructions on the law and fact.

Grand jury secrecy is not absolute. Federal Rule of Criminal Procedure Rule 6(e) authorizes disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).[10] The party seeking disclosure has to make a three-part showing. One, the material is needed to avoid a possible injustice in another judicial proceeding. Two the need for disclosure outweighs the need for continued secrecy. And three, the request is narrowly tailored. *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).

The Sixth Circuit describes the required showing as a "compelling" one. *In re Grand Jury 89-4-72*, 932 F.2d 481, 483 (6th Cir. 1991). The showing is also on a sliding scale: as the need for secrecy weakens, the burden on the party seeking

[10] Note that the Rule only requires a showing that grounds for dismissal "may" exist. Fed. R. Crim. P. 6(e)(3)(E)(ii). Wagner need not prove misconduct before he can see the records that would prove it.

disclosure lessens. *Douglas Oil*, 441 U.S. at 223.[11] "A Court called upon to determine whether grand jury transcripts should be released has substantial discretion" in ordering disclosure so that a defendant may pursue a motion to dismiss. *United States v. Rodriguez-Torres*, 570 F. Supp.2d 237, 241 (D.P.R. 2008) (collecting cases); *see also United States v. McMahon*, 938 F.2d 1501, 1504 (1st Cir. 1991) (same).

Courts also have authority to dismiss an indictment due to errors before the grand jury. Dismissal is proper when "the violation substantially influenced the grand jury's decision to indict," or where there is "grave doubt" that the decision was free from that influence. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). Also, a serious misstatement of the law to the grand jury meets that standard. *United States v. Stevens*, 771 F. Supp. 2d. 556, 567 (D. Md. 2011) (dismissing indictment where prosecutors misinstructed grand jury on a defense that negated mens rea); *United States v. Peralta*, 763 F. Supp. 14, 19–21 (S.D.N.Y. 1991) (dismissing where grand jury was misinstructed on the elements of knowledge and intent).

---

[11] For that matter, some courts hold that a defendant does not need to show particularized need to obtain a prosecutor's legal instructions because they are "ministerial records." *See e.g.*, *United States v. Powell*, No. 22-CR-00003-JSW-1, 2024 WL 3052966, at *1 (N.D. Cal. June 18, 2024) (citing cases); *United States v. Facteau*, No. 1:15-CR-10076-ADB, 2016 WL 4445741, at *4 (D. Mass. Aug. 22, 2016) ("Legal instructions provided by prosecutors do not implicate any of the concerns typically cited in support of grand jury secrecy.").

Finally, the Court need not decide between full disclosure and nothing. It can review the materials *in camera* first. *See Comey* and *Stevens*, *supra*; *United States v. Rabbitt*, No. 25-cr-693 (N.D. Ill.); *United States v. Levy Armstrong, et al*, 26-cr-25 (D. Minn. Aug. 18, 2026) (ECF No. 631).

**a. Grand jury records are needed to support Wagner's motion to dismiss for selective prosecution**

Wagner has offered at least "some evidence" in support of his selective prosecution claim. He is accordingly entitled to discovery to flesh out the claim, *Armstrong*, 517 U.S. at 468; *Jones*, 159 F.3d at 978., Here, that includes grand jury transcripts.

The grand jury process is designed to guard against selective prosecution. The fact that Wagner alone is charged for his communications to J.S. supports the inference that improper motives infected the grand jury process.

Courts in the Sixth Circuit have demonstrated the need at times to investigate internal prosecutor records to determine whether charging decisions were driven by improper motives. In May 2026, the Middle District of Tennessee dismissed the indictment of Kilmar Abrego Garcia as vindictive, finding that senior Justice Department officials reopened an investigation to retaliate against Abrego Garcia for winning his immigration case. *Abrego Garcia*, 833 F.Supp.3d at 825-830. district court could only make that decision, though, after a review of internal communications behind the charge.

Here, the government's presentation would show whether it framed the purpose of the prosecution in partisan terms, whether prosecutors and witnesses improperly emphasized Wagner's politics, affiliations, or opinions, and how they compared him to J.S. If the government attempted to steer jurors based on its favored viewpoint rather than the law, the transcripts would support a selective prosecution claim. Wagner's case looks similar to Abrego Garcia—both committed no crime, but the government used criminal charges to retaliate against them for constitutionally protected activity. Abrego Garcia leaned on his constitutional rights to challenge his deportation, and won. He was then charged with a criminal offense. Wagner dissented from the administration's hardline stance on immigration. He got charged, too.

**b. The risk that the government misinstructed the grand jury on the elements of both counts is especially high**

Separate from the selective prosecution motion, Wagner can demonstrate a significant risk that the government misinstructed the grand jury as to the law on both counts of the Indictment.

*Count One*: Wagner incorporates here his arguments for a Bill of Particulars as to Count One. The indictment here appears to charge Wagner with cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B), on the basis of one online interaction between Wagner and J.S. based on one act, a single Instagram communication made on or about January 29, 2026. But, for the reasons detailed in the motion for Bill of

Particulars, one act does not make up a course of conduct. The discovery thus far provided by the Government does not provide evidentiary support for the "course of conduct" element of Cyberstalking. There is a risk, then, that the grand jury was either misinstructed on the elements of a "course of conduct," or else that the government omitted critical evidence from its grand jury presentation, thereby misleading the grand jury into its determination of probable cause

*Count Two:* Wagner also incorporates by reference his arguments in support of dismissal on First Amendment grounds. His post, read in context, is political hyperbole and not a true threat because it does not satisfy the *actus reus* element of a threat. This creates a strong inference that the "prosecutor's legal instruction to the grand jury seriously misstated" the applicable law to a degree that "cast[s] 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." *Stevens*, 771 F. Supp. 2d at 567 (citing *Peralta*, 763 F. Supp. at 21) (citations omitted and cleaned up). This is not an attempt to second-guess the sufficiency of evidence presented to the grand jury. Rather, Wagner asks whether jurors were accurately informed of the crimes they were asked to find. Here, Wagner is entitled to know whether prosecutors properly instructed on the true-threat requirement.

When there is little factual evidence that speech is threatening, the government's ability to obtain an indictment depends all the more on its framing to

the grand jury. Jurors who are not instructed, for example, that context controls, that hyperbole is protected, or that the speaker's own mental state is material will indict based on speech that is actually protected by the First Amendment. On the other hand, grand jurors who are correctly informed about the law take the true-threat line seriously. In September 2025, for example, a grand jury in the District of Columbia declined to indict a woman accused of threatening the President on social media.[12]

First, there is a risk that the government framed the "threatening" nature of Wagner's communications in partisan terms. Consider the criminal complaint in this case. (ECF No. 1.) The government places outsize emphasis on Wagner's ties to antifa and his online opposition to ICE. (*See id.,* PageID.5-29.) Though the charges stem from one Instagram post and J.S. is not an ICE agent, the complaint spends twenty pages cataloging Wagner's "escalating threats directed against federal law enforcement" on social media (*Id.*, PageID.4.) In front of the grand jury, the government likely submitted the same evidence. This creates a serious risk that the government misrepresented the elements of a true threat not as a threat to a "particular person," *see* Sixth Cir. Pattern Crim. Jury Instr. 18.01(1)(B), (2)(A) (2026), but rather as a threat to law enforcement and/or national security generally.

---

[12] *See* Ryan J. Reilly, *D.C. grand jury declines to indict another defendant amid Trump's crime crackdown*, NBC News (Sept. 2, 2025), https://www.nbcnews.com/politics/justice-department/dc-grand-jury-declines-indict-another-defendant-trumps-crime-crackdown-rcna228527.

Also, Wagner's statements when placed in context are plainly not threatening. As the defense argues in the Motion to Dismiss on First Amendment Grounds, he engaged in a tit-for-tat with J.S. Wagner's post responds to J.S. This clarifies that the "threat" of "we can all knock on strangers doors," referred to J.S.'s own actions. Then, J.S.'s reaction challenging Wagner to a cage fight shows that he was not threatened by Wagner at all. With this background, any reasonable observer would not perceive Wagner's statement to be an authentic threat. This raises the question of whether the grand jury was given the context needed to resolve whether Wagner's statements were truly threatening.

Finally, Wagner is entitled to know which standard the grand jury was given as to Count Two. The mental state required for a conviction under 18 U.S.C. § 875(c) is unsettled in the Sixth Circuit. *See* Sixth Cir. Pattern Crim. Jury Instr. 18.01 & cmt. (2026); *United States v Jeffries*, 692 F3d 473 (6th Cir. 2012.) In *Elonis v. United States*, the Supreme Court held that the statute is satisfied by purpose or knowledge, and expressly declined to decide whether recklessness would also suffice. *Elonis v. United States*, 575 U.S. 723, 740–42 (2015). Eight years later, in *Counterman v. Colorado*, 600 U.S. 66, 69 (2023), the Court held that the First Amendment requires *at least* recklessness. The Sixth Circuit has not joined other courts that read a recklessness standard into § 875(c). *Compare United States v. Howard*, 947 F.3d 936 (6th Cir. 2020) with *United States v. Sheikh*, 164 F.4th 629, 634 (7th Cir. 2026).

This Circuit has applied the purpose or knowledge standard, and its pattern instruction still leaves recklessness out. *See* Sixth Cir. Pattern Crim. Jury Instr. 18.01 & cmt. (2026).

There is good reason to think the government presented recklessness to the grand jury here because the Indictment uses this language. (ECF No. 10, PageID.50) (" . . . with reckless disregard that the communications would be viewed as a threat."). If this grand jury was told that recklessness is sufficient, it could have returned an indictment under a standard the Sixth Circuit has never approved and its own pattern instruction omits. Sixth Cir. Pattern Crim. Jury Instr. 18.01 & cmt. (2026). In a case built on a single post, giving either of the other mental-state instructions would have "substantially influenced the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256. Thus, "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

**c. Recent irregularities in grand jury proceedings rebut the presumption of regularity**

Grand jury proceedings are ordinarily presumed regular. But since the summer of 2025, federal courts across the country have found serious defects in grand jury presentations by the Justice Department. In many of those cases, the defects were invisible until a judge reviewed the transcripts. Courts have also started to question whether the executive branch is still owed the presumption of regularity

at all. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90–92 (D.D.C. 2025). In the last year, the following courts have ordered disclosure:

- *United States v. Levy-Armstrong*, No. 26-cr-25, (D. Minn. Aug. 18, 2026) (ECF No. 631): District court ordered *in camera* review of grand jury materials in prosecution of anti-ICE protestors and journalists covering the protest. The court ordered disclosure of the government's "introduction, legal instruction for the two counts, witness testimony, and closing, including answers to questions from the grand jurors."
- *United States v. Rabbitt, et al.*, No. 25-cr-693 (N.D. Ill.): After the district court ordered disclosure of unredacted transcripts, it found the prosecutor vouched for charges against the "Broadview Six" group of protesters, communicated with a grand juror outside the room, and excused grand jurors who opposed the case. The government had redacted misconduct from the transcripts it first gave the court. The government dismissed all charges with prejudice.
- *United States v. Ocon*, No. 26-cr-39 (D. Wyo. May 15, 2026) (ECF No. 49): A panel of three judges dismissed nine felony indictments, including a murder case, because the interim U.S. Attorney made inflammatory remarks to the grand jury panel, including that a prior grand jury returned an indictment in minutes.

- *United States v. Comey*, No. 1:25-cr-272 (E.D. Va. Nov. 17, 2025) (ECF No. 191): After in camera review, court identified two “fundamental misstatements of the law” to the grand jury and a possible failure to present the operative indictment to the grand jury at all. The court then ordered full disclosure.

The above record does not prove misconduct in this case. Rather, the Court should question the premise that grand jury presentations are reliably regular. The cases above share a common thread: politically charged prosecutions, often involving speech or protest, brought under pressure from the top of the Administration. Wagner’s case fits that profile.

In the alternative, the Court should review the requested transcripts *in camera*. Judicial review allows a “refined assessment of the delicate balance between justice and secrecy . . .” *Anilao v. Spota*, F.Supp.2d 157, 182 (E.D.N.Y. 2013). Therefore, at a minimum, the Court should require the Government to make the grand jury transcripts available to the Court for in camera inspection, at which point the Court can determine whether the Government should be required to disclose the transcripts to the defense.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the indictment for selective prosecution. The Court should also order disclosure of the government’s

presentation to the grand jury resulting in the Indictment, including statements by the prosecutors and case agent(s); witness testimony; legal instructions; and questions by grand jurors. If the Court grants disclosure, it should take the motion to dismiss for selective prosecution under advisement.

Respectfully submitted,

FEDERAL COMMUNITY DEFENDER

s/ Riyah Basha
RIYAH BASHA
ELIZABETH YOUNG
JEAN PIERRE NOGUES
Attorneys for Kyle Wagner
613 Abbott St., 5th Fl.
(313) 556-3021
riyah_basha@fd.org

Dated: November 16, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, CR. No. 26-20059

v. HON. Denise Page Hood

KYLE WAGNER,

Defendant.
_________________________________/

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send any required notification to opposing counsel.

**FEDERAL COMMUNITY DEFENDER**
**EASTERN DISTRICT OF MICHIGAN**

s/Riyah Basha
RIYAH BASHA
Attorney for Defendant
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 556-3021
riyah_basha@fd.org

Dated: November 16, 2026